# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 22 2019, 9:18 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John T. Wilson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: M.F., Minor Child,

J.F., Father

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

February 22, 2019

Court of Appeals Case No. 18A-JT-1845

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause No. 48C02-1712-JT-107

**Brown, Judge.**

[1] J.F. ("Father") appeals the involuntary termination of his parental rights with respect to his child, M.F. We affirm.

### Facts and Procedural History

[2] Father and A.P. ("Mother") are the parents of M.F., who was born in December 2015.[1] M.F. was born THC positive. M.F., and his older sibling, M.O., were removed from the home on February 17, 2016. On February 18, 2016, the Indiana Department of Child Services ("DCS") filed a petition alleging that M.F. was a child in need of services ("CHINS"). The petition alleged that: M.F.'s sibling, M.O., sustained burns, redness, or blistering to his hand; Father and Mother did not seek medical treatment; Mother held M.O.'s hand under a hot water faucet as punishment; M.O. had been locked in the basement on occasion as punishment causing him to be fearful and to cry for help; and Mother and/or Father had failed to provide appropriate supervision or care to M.F. in that they did not engage in safe sleeping practices. Also, on February 18, 2016, the court entered an Order on Initial/Detention Hearing indicating that it had held a hearing, found that Father and Mother admitted the allegations in the petition, and concluded that the removal of M.F. was authorized and necessary to protect the child. The court also entered its Order Authorizing Filing of CHINS Petition.

---

[1] Mother was married to another man when M.F. was born, but genetic testing revealed that Father is M.F.'s father. Mother and Father are also parents of a second child. At the June 12, 2018 hearing, M.F.'s maternal grandmother testified that the second child was eight months old. Mother does not appeal the termination of her parental rights as to M.F.

[3] On March 16, 2016, the court entered an Order on Dispositional Hearing. It ordered Father to contact the case manager every week; notify the case manager of any changes in address, household composition, employment, or telephone number within five days; notify the case manager of any arrest or criminal charges for any household member within five days of the charge; allow the case manager or other service providers to make announced or unannounced visits to the home; enroll in recommended programs; keep all appointments; remain in the county; maintain suitable housing; secure and maintain a legal and stable source of income; not use illegal controlled substances or alcohol; participate in counseling; complete a parenting assessment; complete a substance abuse assessment; submit to random drug/alcohol screens; not commit any acts of domestic violence; and "attend all schooled visitations with the child." Appellant's Appendix Volume II at 22. On September 20, 2016, the court entered an Order on Periodic Case Review finding that Father had not complied with the case plan and was non-compliant with services.

[4] On December 14, 2017, DCS filed a Verified Petition for Involuntary Termination of Parent-Child Relationship. On January 11, 2018, the court held a hearing. Kaylee Jones of the Madison County Department of Child Services testified that she was assigned as M.F.'s permanency case manager, that Father and Mother had not notified her of changes of address or household composition within five days as ordered in the dispositional order, which was a safety concern. She testified that Father had not notified her of any arrests or

criminal charges within five days, that he had been pulled over for DWI and placed in jail and currently had a warrant in that cause, and that "there is also a police call for disturbance on New Year's Day." Transcript Volume II at 8. She stated that Father did not complete home based services and that his medication management was a safety concern because he had been diagnosed with anxiety and depression, and relapse is very common if not handled appropriately. She testified that Mother was arrested for domestic battery on May 29, 2016, services were recommended for both parents in October 2016, and neither parent completed those services. She stated that Father was visiting once weekly for two hours and "had a no show for the visit last week." *Id.* at 13.

[5] Deondre Hill testified that he worked with M.F. and Father and supervised visits for approximately three months, and that Father was consistent but had missed two visits including one the previous week.

[6] Christy Green, a home based case manager and visitation supervisor, testified that she worked with Father between October 2016 and July 2017, that he consistently missed visits, would be late, and failed to bring the appropriate supplies, but had improved with respect to bringing supplies during the last three months. She expressed concern with Father's ability to ascertain what was safe for a child of M.F.'s age and that he "just was not able to understand child development well enough to be able to care for [M.F.] on his own without supervision." *Id.* at 25.

[7] Thomas Asaunte, a mental health and addiction therapist with Adult and Child Services, testified that Father was one of his clients receiving addiction counseling services, that he had been working with Father for about one month, and that it was his understanding that Father had completed IOP prior to becoming his client. He testified that he had four visits with Father, that his current impression was that Father was making progress, and that he needed to be with Father longer than one month to provide a full assessment.

[8] At the end of the hearing, the court stated that it would continue Father's treatment, drug screens, and visitation. The court mentioned the petition to terminate parental rights and indicated that it would enter a denial for Father and Mother.

[9] On June 12, 2018, a termination hearing was held. Greenwood Police Sergeant James Brian Long testified that he had been called to Mother's address on April 30, 2018, based upon her report that "her apartment building was broke in to by her son's father." *Id.* at 55. Sergeant Long stated that he observed that the front door was kicked in and that he was unable to locate Father at the time. He indicated that a Playstation 4 and some type of sexual toy were taken from the home but no charges were filed because he was "having a hard time establishing whether or not [Father] did not have a right to be there." *Id.* at 56.

[10] Jones, the permanency case manager, testified that she had the case since October 2016 and that M.F.'s removal was based on Mother burning the older child with water, M.F. being born exposed to THC, and unsafe sleep practices.

She stated that DCS offered family counseling to the parents and that a referral was made on March 9, 2016, but that service was not completed successfully. She testified that the parents completed a parenting assessment, but neither parent followed through with the recommendations, and that DCS offered clinical interview services to parents on May 16, 2006, but that was not completed successfully. She stated that Father successfully completed a substance abuse assessment but did not successfully complete the substance abuse treatment because he tested positive for hydrocodone in March 2018 and also relapsed in May 2018. She stated that parents did not comply with drug screen referrals and did not successfully complete home based services, and that Father had been somewhat compliant with visitation but "there were a few recent no shows or cancellations." *Id.* at 66. She also stated that Father did not successfully complete a referral for home maker services or fatherhood engagement. On cross-examination, Jones stated that Father's drug screens were currently suspended due to "no shows or refusals." *Id.* at 87.

[11] Asaunte, the mental health and addiction therapist, testified that Father enrolled in addiction treatment in November 2017. When asked if there was a point where Father relapsed, Asaunte answered: "I have his records his screens here, it was only on March 22, he had a positive for Opiate but he brought in his prescription medication which was prescribed for him in July and he proved that he didn't really relapse (INAUDIBLE)." *Id.* at 94. On cross-examination by Father's counsel, Asaunte responded that Father successfully completed his part of the program and volunteered to do more.

[12]     Jasmine May, an employee of Children's Bureau, testified that she had the case since April 24th and that Father had not visited consistently with M.F. She indicated that she had concerns with Father's parenting skills and stated:

> [Father] lacks parenting, he is a great father during visit time but he, he doesn't really know how to respond to [M.F.] appropriately . . . for instance, we were in the library for community visit and [M.F.] was running around playing and stuff like that and [Father] didn't really know how to you know, maintain him being quiet . . . other than that . . . that's about it.

*Id.* at 101. When asked if she had any safety concerns, May answered:

> [M]y only safety concern that I would have with [Father] at this moment is when May 16th, I'm sorry, May 10th he smelled of alcohol . . . , I brought it to [Father's] attention and [Father] denied it stating that he did not smell of alcohol. May 16th is when he stated that he had the food poisoning but later down the road told his FCM that he had been drinking the night before . . . .

*Id.* at 102. On cross-examination, May testified that Father "doesn't really know how to interact with" M.F. *Id.* She stated that Father missed three of seven sessions with her.

[13]     Green, the supervised visitation facilitator, testified that she had the case for approximately nine months between October 2016 and June or July 2017, that visits were initially scheduled for twice a week for a total of five hours, and that visits were reduced because Father did not show up, showed up late, and did not bring the appropriate supplies. She indicated that she had safety concerns

and that she "never saw [Father] demonstrate the ability to parent his child safely without like constant redirection and guidance and help and that kind of thing." *Id.* at 108.

[14] Emma Johnson testified that she met Father and Mother in January 2015 when Mother reached out to the Safe Families program for help with M.O., her oldest son. She testified that she was the director of Safe Families in Madison County for four years and had since relocated to Oregon and was in the process of adopting M.O. She stated that she had safety concerns with Father "primarily because of the dysfunctional relationship between he and" Mother. *Id.* at 114. She testified that, during the time M.O. and M.F. were removed from the home, she talked to Father and encouraged him to leave Mother, obtain an apartment, and try to gain custody of M.F. by himself, and that she "even offered to rally the support of our community and to donate furniture and to really help him get set up on his own since the case was between [Mother] and [M.O.] and he made no effort at all to take me up on that" and "he didn't try at all to get his own place even though it would have gotten his child back a lot sooner." *Id.* at 115. She testified that Mother called her in the spring of 2016 when she and Father were in a "very violent and physical fight" and that Mother was ultimately taken to jail for three days. *Id.*

[15] On cross-examination, Johnson testified that the services she last provided through Safe Families ended at the time that the DCS case began, that Father has called her for advice, and that she has "encouraged [Father] time and time and time again to move on with his life and I tried to help him understand that

they are in a co-dependent dysfunctional relationship . . . ." *Id.* at 117-118. When asked if most of the domestic violence was Mother being physically violent with Father, she answered in part that M.O. "still to this day talks about watching [Father] punch [Mother] in the face so I don't have hard evidence that it goes both ways, I truly believe that it goes both ways between the two of them equally but . . . the only one that I can attest to that is on record is where she you know was the abuser." *Id.* at 118.

[16] Casey Lynn Conrad testified that M.F. had been in her care since he was three and a half months old and that Father "only had two hour visits with him for over a year." *Id.* at 123. M.F.'s court appointed special advocate, Danielle Bell ("CASA Bell"), testified that she did not think there was a reasonable probability that the reasons for M.F.'s removal would be remedied and that adoption is in M.F.'s best interest.

[17] Father presented the testimony of M.F.'s maternal grandmother and great-grandmother. M.F.'s grandmother testified that Father resided with her and her mother, was a good man, and loved his children. She also testified that she did not see him drinking at her apartment but that Father spent most of the time by himself. M.F.'s great-grandmother testified that she did not have any concerns about Father's parenting skills and had not seen him inebriated.

[18] When asked to describe his employment since the case had been opened, Father testified that he had been an independent contractor, worked in warehouses, worked at a mall in Indianapolis, worked at a mall in Greenwood, had a period

of time when he did not work, obtained another job for about three weeks, and did not obtain another job besides caring for M.F.'s grandmother and great-grandmother. When asked where he had lived during the case, he answered: "the Anderson house, and then my sisters [sic] house on Wheeler Street in Indianapolis, and then after that we ended up getting, oh that's when I did the half-way house thing, [Mother] ended up moving in with her brother uh and then she moved into a couple half way houses at that time." *Id.* at 150. He also stated that he and Mother then decided to reunite and moved to Greenwood. He testified that he did not previously listen to the encouragement to separate from Mother because he "fell in love with that good [Mother]," and that he did not believe he would ever do that again. *Id.* at 153.

[19] During the direct examination of Father, the following exchange occurred:

> Q. There's been some . . . testimony or some assumptions or some allegations that you had relapsed recently.
>
> A. I did. Yep, it is.
>
> Q. What would that consist of?
>
> A. Alcohol[.]
>
> Q. All right. How much alcohol?
>
> A. Oh, I don't usually drink beers. It's just a quick little 4-5 shots, that's it. You know, I try my best to you know, stay away from it . . . and I know it was [a] mistake and I know I'm capable of, I stayed a year sober. You know, if I have a goal to work towards, eliminate evil out of it. I am very confident in myself. But yeah, I made a couple mistakes. Relapse maybe 2-3 times

but if I, if I have a positive goal to work to, I don't think it will ever happen again.

\* \* \* \* \*

Q. When was the last time you had a drink?

A. Two nights ago.

*Id.* at 156. He testified that his positive drug screen was due to a prescription and that he did not have a problem with opiates.

Father's counsel asked: "You had a problem the last couple of months as a result of what?" *Id.* at 163. Father answered: "Oh, just losing my home, my car, and my family and potentially my son, my first born son, [M.F.]." *Id.* He also stated: "I would like, there's a lot that I would like but I would like a different team of people to start brand new fresh and I think you know a second chance would be very fair as long as I eliminate a certain person out of the equation." *Id.* at 164.

On July 5, 2018, the court entered a ten-page order terminating the parent-child relationship between Father and Mother and M.F. In part, the order states:

### Findings of Fact

The Court finds by clear and convincing evidence:

1.) [M.F.] was born December 16, 2015, and was two years old on the date of the trial completed on this matter.

\* \* \* \* \*

7.) The CHINS Court conducted a review hearing on September 20, 2016, making the following findings from which the Court finds the following facts and inferences for the purposes of the termination proceedings.

a. Father and Mother appeared in person, and by counsel, Jon Reeder.
b. Neither parent has complied with services, enhanced their ability to parent, but both have visited the children.
c. Mother admitted to smoking marijuana and driving without a license, and was arrested for domestic battery during this period.
d. Father tested positive for benzodiazepines and struggled with alcohol.

* * * * *

11.) The CHINS Court conducted a permanency hearing on April 18, 2017, making the following findings from which the Court finds the following facts and inferences for the purposes of the termination proceedings.

* * * * *

d. Father took only 5 drug screens in the period (two positive), repeatedly cancelled or no-showed for his parenting assessment, and by failing to communicate contact information changes to the Department was unable to begin Fatherhood Engagement. Issues with visitation led to visits being cut back from twice weekly to once weekly.

* * * * *

16.) On or about May 2, 2018, DCS filed a report to the CHINS Court detailing the history of the case and the non-compliance of both parents as well as notified the Court of a recent incident between the parents that had led to them no longer co-habitating and the involvement of the Greenwood Police.

* * * * *

20.) At the trial on the termination petition conducted on June 12, 2018, [] Kaylee Jones, Permanency Family Case Manager testified. The Court makes the following findings and reasonable inferences from this testimony for the purposes of these termination proceedings.

* * * * *

l. DCS provided the following services to [Father] and he was not compliant in those services.

    i. Family counseling
    ii. Medication evaluation at [Father's] request
    iii. Ongoing medication services
    iv. Parenting assessment
    v. Clinical Interview services
    vi. Substance Abuse assessment services
    vii. Outpatient treatment services
    viii. Random drug screens
    ix. Urine drug screens
    x. Gas cards were provided for visitation
    xi. Home-based casework
    xii. Home maker services
    xiii. Fatherhood engagement
    xiv. Supervised visitation

m. There is no reasonable probability the conditions which led to the removals will be remedied.

n. Termination of the parent-child relationship is in the children's best interest.

o. A satisfactory plan of adoption exists for the care and treatment of the minor children.

21.) [Based on the testimony of Jasmine Nave, the court found:]

a. [Father] has not visited [M.F.] in the last month.

b. [Father] has regressed in bringing supplies for the minor child.

c. [Father] struggles to interact appropriately with the child, ie they tend to just watch videos on his phone, and [Father] is not always able to properly parent/correct the child when visits occur in public places.

22.) [Based on Thomas Asaunte's testimony, the court found:]

a. Mr. [Asaunte] was [Father's] substance abuse therapist.
b. Father did a six week program with sessions twice weekly in March-April of 2018.
c. Father requested the program be extended.
d. Father informed Mr. [Asaunte] that he had drank after the six week program was completed, but Mr. [Asaunte] does not consider that a relapse as it occurred after the six week program was completed.
e. Father has attended no sessions since informing Mr. [Asaunte] of his drinking.

23.) [Based on Christy Green's testimony, the court found:]

a. Father was inconsistent in visiting [M.F.].
b. Father was often unprepared to meet [M.F.'s] needs during visitation.
c. Issues with visitation led to a reduction of visits from twice weekly to once weekly during Ms. Green's tenure with the case.

24.) [Based on Emma Johnson's testimony, the court found:]

a. Mrs. Johnson became involved with the family before DCS opened the case.
b. Safe Families provided services to the family before DCS involvement.
c. Both parents have individually reached out to Mrs. Johnson for help and advice since they began working with Safe Families.

  d. Mrs. Johnson advised [Father] that his relationship with [Mother] was toxic and it would be in [M.F.'s] best interest if they separated.

  e. Mrs. Johnson has been involved as either a service provider or a foster parent for longer than the DCS case has been opened and has witnessed the parents' pattern of domestic violence and reconciliation multiple times.

* * * * *

27.) [Based on Father's testimony, the court found:]

  a. [Father] is currently unemployed.

  b. [Father] no longer lives with [Mother] and their youngest child.

  c. [Father] lives with [Mother's] mother and grandmother.

  d. [Father] stated he took the game system and sex toy, but did not break in to do so and he wanted to get his things.

  e. [Father] testified the door at his former residence was damaged on or around New Years of 2018 during a domestic violence incident in which [Mother] threw him into the door.

  f. This New Year's Day incident occurred in the presence of the couple's youngest child as well as [Mother's] mother and grandmother.

  g. [Father] testified he did relapse with alcohol usage in May of 2018.

  h. [Father] testified he cannot explain why he has continued to get back together with [Mother] other than he loves her.

  i. [Father] stated he will not be getting back together with her ever again.

Appellant's Appendix Volume II at 45-52.

[22] The court concluded that there was a reasonable probability that the conditions that resulted in M.F.'s removal from and continued placement outside the care

and custody of the parents would not be remedied; termination of the parent-child relationship between the parents and M.F. was in the best interests of M.F.; and the plan of DCS of adoption of M.F. was acceptable and satisfactory.

### *Discussion*

[23] The issue is whether the evidence is sufficient to support the termination of Father's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[24] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id.* We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our

judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[25] Father argues that DCS failed to prove by clear and convincing evidence that the conditions resulting in the removal of M.F. would not be remedied or that termination was in the best interest of M.F. He asserts that the "primary condition for the child's removal was due to Mother burning the older child and M.F. being born drug exposed to THC." Appellant's Brief at 11. He contends that the record shows that he was in substantial compliance with the case plan. DCS asserts there was a reasonable probability that the conditions that led to M.F.'s removal would not be remedied, and that Father did not participate in a majority of services and had a pattern of relapsing, never provided evidence of a permanent job, and never obtained suitable housing. DCS also contends that termination is in M.F.'s best interest.

[26] In determining whether the conditions that resulted in M.F.'s removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history

more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.*

[27] The statute does not simply focus on the initial basis for a child's removal, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id*. Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[28] To the extent Father does not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[29] During the direct examination of Jones, the permanency case manager, the following exchange occurred:

> Q. . . . Based on your time in this case and the testimony you just provided in court, is there reasonable probability that the conditions that lead to the removal of [M.F.] be remedied?

A. No.

Q. Why do you say that?

A. Neither parent has successfully completed any of the services DCS has put in place that they were court ordered to participate in at the dispositional hearing. [I]t's been clearly established that the parents have cycling behavior of . . . being together, being okay for a little bit, getting into drinking, drugs, domestic violence, getting arrested or having criminal charges, . . . being separated for a while and then doing it all over again and getting back together. We just recently saw that . . . at the initial TPR hearing everything was going well[;] since that time, [Father] has been kicked out of the home. There have been several police calls. Uh, [Father] has relapsed. It's clear at this point that there is a cycle of issues with their relationship that severely puts [M.F.]'s safety at risk.

Transcript Volume II at 67.

[30] Green, the supervised visitation facilitator, testified that she had the case for approximately nine months between October 2016 and June or July 2017 and that "[t]here was not a time that I supervised visitation where I was confident that [Father] would be able to care for [M.F.] without the assistance of DCS or somebody being involved to guide him and his ability to parent." *Id.* at 107-108.

[31] The following exchange occurred during the direct examination of CASA Bell:

Q. [B]ased on your time on this case, is there reasonable probability that the reasons for the removal will be remedied?

A. Uhm, I do not think so.

Q. All right and why do you say that?

A. [A]s I stated in my report, . . . CASA feels that there is no reasonable probability that the conditions that caused [M.F.'s] removal or the reasons for the continued placement outside of the home will not be remedied due to [Mother] and [Father's] inconsistency and lack of compliance with offered services and ability or refusal to maintain a safe stable home and ability or refusal to provide or maintain a source of income and ability or refusal to obey the law, provide a safe environment without domestic violence and/or an ability or refusal to maintain commitment to [M.F.'s] best interest for safety and permanency needs as evidence[d] by lack of and/or adherent to utilization of appropriate and healthy coping skills provided by services offered.

*Id.* at 125.

[32]   Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to M.F.'s removal will not be remedied.

[33]   In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children

cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[34] Jones, the permanency case manager, and CASA Bell testified that adoption was in M.F.'s best interest. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the determination that termination is in the best interests of M.F. is supported by clear and convincing evidence.

### *Conclusion*

[35] We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

[36] Affirmed.

Bradford, J., concurs.

Bailey, J., concurs in result.